**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| ALMONDNET, INC.,<br><br>Plaintiff,<br><br>v.<br><br>OATH HOLDINGS INC.<br><br>Defendant. | Civil Action No.<br><br>**Jury Trial Demanded** |

**COMPLAINT**

Plaintiff AlmondNet, Inc. ("AlmondNet") for its Complaint for patent infringement against defendant Oath Holdings Inc. ("Oath"), including Oath's BrightRoll and former Yahoo units, hereby demand a jury trial and allege as follows:

**NATURE OF THE ACTION**

1. This is a civil action charging Oath with infringement of a patent owned by AlmondNet, arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, and more particularly 35 U.S.C. § 271.

**ALMONDNET AND ITS ACTIVITIES**

2. Plaintiff AlmondNet is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 37-18 Northern Boulevard, Suite 404, Long Island City, New York 11101.

3. Founded in 1998, AlmondNet specializes in media and Internet advertising software and solutions. AlmondNet developed an extensive suite of targeted-advertising products, which helped revolutionize display and search advertising and increase the efficiency of the Internet-advertising market.

4. AlmondNet owns a significant portfolio of patents relevant to advertisement targeting, including in such areas as profile-based bidding, behavioral targeting, addressable advertising, and multi-platform advertising. AlmondNet is currently focused on R&D and the licensing of its patents, while its subsidiaries (Datonics, LLC and Intent IQ, LLC) offer services to the public, generally in the fields of data aggregation, data distribution, and cross-device targeting.

5. In particular, based on AlmondNet patented technology, Datonics offers data users (including ad networks, ad exchanges, demand side platforms, and publishers) pre-packaged or customized keyword-based "data segments" that can facilitate the delivery of advertisements to consumers wherever they go online, with the ads being focused on subjects relevant to the individual consumer yet delivered in a privacy-sensitive way. Intent IQ operates a "demand side platform" (DSP) that competes with Oath's DSP. A DSP is a system that allows advertisers or their representatives (who buy digital advertising inventory) to place ads by managing multiple accounts with ad exchange and data exchange companies through one interface. Such exchanges act as intermediaries to facilitate sale of space on websites and other "media properties."

**OATH AND ITS ACTIVITIES**

6. Defendant Oath is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 701 First Avenue, Sunnyvale, CA 94089.

7. BrightRoll is, upon information and belief, a unit of Oath. Oath was formerly known as Yahoo!. AlmondNet is suing Oath for acts performed by both Oath directly, and before it, Yahoo!, and its Brightroll unit.

8. Oath is a world-wide provider of various Internet-based products and services, including online advertising services. Oath offers advertising services including search, content, and behavioral advertising on Oath-owned and -operated properties, across the web and across devices including personal computers and mobile devices.

9. Oath facilitates its advertising services to advertisers through various ad solutions. Oath's services allow delivery of advertisements in a variety of formats based on user profile information – originating from search, mail, digital content consumption, Smart TV, mobile app usage, registrations, offline purchases, and more – for delivery on both Oath and non-Oath properties, across consumers' desktops, tablets, and smartphones.

10. Oath facilitates advertising services using different platforms including ad exchanges and online ad management platforms. In or about January 2014, Oath's predecessor Yahoo! announced a service called Yahoo Ad Exchange (YAX) and a targeting product called Yahoo Audience Ads. YAX allows "audience sharing," enabling ad space buyers on the exchange to target audiences from multiple data providers to deliver targeted ads on Yahoo or non-Yahoo websites. Yahoo Audience Ads allows targeting ads both on properties in the Yahoo content network and off-network.

11. In November 2014, Yahoo! acquired Brightroll for $640 million. BrightRoll is a world-wide provider of online-advertising services. Brightroll offers video advertising platforms called BrightRoll Exchange, available at http://www.brightroll.com/exchange and BrightRoll Demand Side Platform, available at http://www.brightroll.com/demand-side-platform. Through those platforms, Brightroll delivers, manages, and measures the performance of digital video ad campaigns across

web, mobile, and connected TV. BrightRoll allows advertisers to purchase targeted ads, which are shown to website visitors who fit the advertisers' interest criteria, including on non-Yahoo websites.

12. In March 2015, Yahoo! announced that Brightroll would begin using Yahoo audience data, *i.e.*, information about visitors to Yahoo-owned or Yahoo-operated websites, in its ad targeting.

13. In September 2015 Yahoo! announced that it had consolidated all of its programmatic ad technology under a single umbrella – the BrightRoll brand.

14. In July 2016, Verizon entered into a stock purchase agreement with Yahoo! Inc. Pursuant to the Purchase Agreement Verizon agreed to acquire the stock of one or more subsidiaries of Yahoo! holding all of Yahoo's operating business.

15. On or about July 20, 2016, Yahoo! Inc. formed Yahoo Holdings, Inc. as its wholly owned subsidiary, which Verizon agreed to purchase pursuant to the Purchase Agreement. Yahoo Holdings, Inc. is a Delaware corporation with an office located at 701 First Avenue, Sunnyvale, California, 94089.

16. Effective June 13, 2017, Yahoo! Inc. transferred to Yahoo Holdings, Inc. the operating business of Yahoo! Yahoo Holdings, Inc. then became a wholly owned subsidiary of Verizon Communications, Inc.

17. In February 2018, Yahoo Holdings, Inc. changed its name to Oath Holdings Inc.

18. Upon information and belief, Oath Holdings Inc. owns, operates, and controls the platforms, services, and computer systems referenced in this Complaint.

## JURISDICTION AND VENUE

19. This Court has jurisdiction over the subject matter of this action under, at least, 35 U.S.C. §281 and 28 U.S.C. §§1331, 1332, 1338(a), 2201, and 2202.

20. Personal jurisdiction over Oath is proper because Oath is incorporated in Delaware.

21. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) and 1400(b) because Oath is incorporated in Delaware.

## THE PATENT AND ITS FAMILY

22. On November 28, 2017, the United States Patent & Trademark Office issued U.S. Patent 9,830,615, entitled "Electronic ad direction through a computer system controlling ad space on multiple media properties based on a viewer's previous website visit" ("the '615 Patent). A true and correct copy of the '615 Patent is attached as Exhibit A, including a certificate of correction.

23. AlmondNet owns and has the right to enforce the '615 Patent.

24. The '615 Patent has an effective filing date of June 14, 2007, and claims priority to two provisional applications, filed June 16 and 19, 2006.

25. The '615 Patent is the eighth patent that issued from the original patent specification filed on June 14, 2007. AlmondNet refers to the '615 Patent and its seven related patents as the "Media Property Selection" (MPS) family.

26. AlmondNet's CEO, Roy Shkedi, is the inventor of the '615 Patent.

## OATH'S DIRECT INFRINGEMENT OF THE '615 PATENT

27. Oath infringes each and every one of the 17 claims of the '615 Patent.

28. Via at least the platforms, products, and services described in this Complaint, Oath has sold or facilitated the sale of targeted ads to advertisers, so that when users visit a website on which Oath has the capabilities to show those users ads, ads relevant to each user's specific interest are shown on behalf of those advertisers.

29. By marketing, selling, offering to sell, providing, instructing, supplying, operating, licensing, or supporting the services, platforms, products, or activities described in this Complaint, Oath infringes the claims of the '615 Patent, especially through its demand side platforms, whether labeled Oath, Yahoo, Brightroll, or other ("Oath's DSP"). The following paragraphs specify how Oath's services, platforms, products, and activities infringe the '615 Patent. The descriptions below are not intended as exclusive; discovery may reveal additional infringement types, instances, or methods.

30. Oath, through Oath's DSP computer systems, infringes the claims of the '615 Patent on behalf of various of its advertiser customers. Oath's DSP includes computer systems that are programmed to automatically perform the methods described in each of claims 1-8 of the '615 Patent. Oath's DSP computer systems are structured and programmed as indicated in each of claims 9-13 of the '615 Patent. Oath's DSP contains tangible computer storage devices that encode software that, when applied to the computer system, instruct Oath's DSP in the manners indicated in each of claims 14-17 of the '615 Patent.

31. Oath's DSP performs techniques claimed in the '615 Patent automatically for advertiser clients or their representatives who wish to advertise on websites that are not Oath-owned or -operated properties. Oath's infringement of the '615 Patent through its Oath's DSP computer systems includes the action of recording, in visitor profiles

maintained by Oath on Oath computers, profile data collected when a visitor computer visits a website. The profile data may reflect what a user did on the website, one example of which is a search requested by the user, or demographic information disclosed by the user on the website. This information may be collected in the form of profile attributes and may be categorized into "segments."

32. The websites visited by such visitor computers may be (a) the advertiser's own websites, where the advertiser desires to retarget ads to its website visitors on other websites, (b) Oath-owned or -operated websites, or non-Oath websites, that contributed attribute data (directly or via a data aggregator such as BlueKai) that the Oath customer may wish to use to do ad targeting, or (c) sites of publishers desiring to implement audience extension to deliver advertiser ads on properties other than the publisher's properties, including publishers on which an Oath customer has an arrangement to deliver its ads. In the capacities described in this paragraph, Oath acts as a behavioral targeting company ("BT company" in the claims), and Oath's DSP qualifies as a "BT computer system" in the claims.

33. The visitor computer may be a laptop, tablet, smart phone, or desktop computer.

34. Oath's DSP communicates with various entities, such as ad exchanges or supply side platforms (SSPs), each of which have one or more computer systems controlling ad space on many non-Oath media properties. The controlled ad space is on media properties that are typically websites on which the ad space is controlled only temporarily, but they may also be media properties other than Internet sites.

35. Oath's infringement of the '615 Patent through Oath's DSP computer systems includes the action of arranging for a particular one of the above-described entities to tag visitor computers to the above-described websites with a tag readable by computers within the domain of the entity. The tag, which may be a cookie, identifies the visitor computer as associated with Oath's DSP. Oath's DSP typically performs this task by arranging for the above-described entities to associate a cookie stored on the visitor's computer with Oath's DSP, which may be done by cookie mapping or ID swapping between Oath's DSP and the SSP or ad network.

36. In performing the task described in the previous paragraph, Oath's DSP does not transfer to the entity any profile information related to the visitor.

37. Oath's infringement of the '615 Patent through its Oath's DSP computer systems includes the action of automatically electronically transmitting a bid to one of the above-described entities. The bid contains a price cap identifying a maximum price that Oath is willing to pay for allowing delivery of a customer's advertisement in an ad space controlled by such entity. The price that the advertiser (Oath's customer) is willing to pay, and in turn the price that Oath's DSP bids, depends on which profile attributes match the specific end user. By delivering a "real time bidding" bid under the "open RTB" standard with a price cap, Oath's DSP thereby causes the ad exchange or SSP to display the ad only if it can do so for a charge less than the price cap in the bid.

38. Oath's infringement of the '615 Patent through Oath's DSP computer systems includes the following actions: After the time Oath's DSP arranges for the above-described entity to associate the tag with the Oath DSP (*see* para. 35, *supra*), when a visitor computer is viewing a website or other media property having advertising space

controlled by the above-referenced entity, Oath's DSP receives a redirection of the visitor computer if Oath DSP's bid is accepted. Upon receipt of the redirection, Oath's DSP causes the targeted or retargeted advertisement to be delivered to the visitor computer based on associated profile attributes, either by serving the ad directly or by calling an ad server to serve the ad. The ad may be delivered to the visitor computer along with content of the website visited by the visitor.

39. In some instances, Oath's DSP uses the profile information associated with the visitor to select the advertisement and serves the advertisement to the visitor computer in the above-referenced ad space.

40. Afterwards, Oath's DSP may save data indicating that Oath owes the price for the ad space to the SSP or ad exchange on account of the ad having been shown to the visitor computer as described above.

41. AlmondNet has further described its knowledge of the Oath DSP computer systems through the infringement contentions describing Oath's infringement of the related MPS patents in the New York lawsuit referenced below.

**OATH'S KNOWLEDGE OF THE MPS FAMILY AND OF THE '615 PATENT AND WILLFUL INFRINGEMENT**

42. On information and belief, Oath had actual knowledge of the above-listed patent by virtue of the following facts.

43. AlmondNet and Oath's predecessor, Yahoo! Inc., had discussions about AlmondNet's inventions in at least 2006, 2013, and 2015.

44. In 2015 at least, AlmondNet specifically advised Yahoo of a large number of patents that had issued by that time, including certain patents that were parents to the

‘615 Patent in the MPS patent family, and of AlmondNet’s belief that Yahoo’s activities and computer systems infringed the MPS patents.

45. AlmondNet and its subsidiaries, Datonics and IIQ, sued Yahoo in the Eastern District of New York in 2016 for infringement of, *inter alia*, two parent patents to the ‘615 Patent in the MPS family of patents. In April 2017, AlmondNet added a third MPS parent to that lawsuit. AlmondNet contended through that complaint, and subsequent papers filed and served on Yahoo including the amended complaint, that the MPS family applied to activity in the above-described fields of Yahoo, and later Yahoo Holdings and Oath.

46. Yahoo, and later Oath, monitored the progress of the application that issued as the ‘615 Patent and noted its issuance.

47. The ‘615 Patent issued after presentation to the patent examiner of the prior art references that Yahoo contended applied to invalidate the parent MPS patents.

48. Yahoo’s arguments in the New York lawsuit for non-infringement of the parent MPS patents do not apply to the ‘615 Patent.

49. In 2017, Yahoo filed two “covered business method” (CBM) petitions with the Patent Office related to the two parent MPS patents listed in the 2016 New York complaint. Through those petitions, Yahoo sought to declare both patents invalid as not patent-eligible under 35 U.S.C. §101. The Patent Office refused to institute the proceeding, holding that the two patents were not “covered business method” patents. Thus Yahoo was unsuccessful in having the parent MPS patents declared not patent-eligible.

50. It its above-described CBM petitions, though, Yahoo directed the Patent Office to the then-pending '762 Application, which eventually issued as this '615 Patent. At the time of the petitions, the examiner had rejected the claims as patent-ineligible under Section 101 but applicant had not responded, and Yahoo utilized this fact to support its arguments of patent-ineligibility. Yahoo presented as an exhibit to its CBM petitions the then-current part of the '762 Applicant's file history. With Patent Owner's Preliminary Statement filed in September 2017, AlmondNet supplied an updated part of the file history, which extended through the notice of allowance. It is clear, therefore, that Yahoo and Yahoo Holdings (since renamed Oath) monitored the pending '762 Application and had information that the application was allowed.

51. The '615 Patent issued after AlmondNet pointed the patent examiner to Yahoo's arguments in its CBM petitions. From the updated file history provided to it, Yahoo knew that the patent examiner had reviewed Yahoo's prior art cited against the parent MPS patents and Yahoo's CBM filings in connection with the examiner's issuance of the notice of allowance.

52. Accordingly, Oath's infringement of the '615 Patent was, and continues to be, willful and deliberate.

53. AlmondNet has been damaged by Oath's infringement of the above-listed patents and will suffer irreparable injury unless the infringement is enjoined by this Court. AlmondNet's subsidiaries Datonics and IIQ are operating entities whose ongoing businesses are being harmed by Oath's infringement. Datonics and IIQ have non-exclusive licenses under the '615 Patent. Among other harm, IIQ could have significantly higher business from its DSP system, if Oath did not utilize the invention claimed in the

‘615 Patent. AlmondNet is a stockholder in each of Datonics and IIQ and will be harmed as well by virtue of expected loss of value of its ownership stake in those operating entities. On account of Oath’s infringement of the patents-in-suit, AlmondNet’s activities in furthering the operation of its operating subsidiaries’ businesses have become difficult.

**OATH’S INDIRECT INFRINGEMENT**

54. In the alternative, Oath may be found to have induced infringement of the ‘615 Patent. As indicated above, Oath had knowledge of the ‘615 Patent and intended to induce infringement. Oath also has knowledge of the ‘615 Patent by (1) the filing of this Complaint, (2) discussions with Oath counsel before service, and (3) the service of this Complaint.

55. Oath has encouraged and continues to encourage others to infringe. In particular, Oath instructs and supports the use of the infringing DSP system by its customers through Oath’s DSP online website interface, customer instruction manuals and instruction sheets, and statements made by customer service and training representatives.

56. To the extent Oath does not control the DSP system, Oath’s customers put the DSP system, configured as described above, into operation under their control and benefit from use of the apparatus, pursuant to Oath’s encouragement, instruction, and support.

**JURY DEMAND**

57. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, AlmondNet hereby respectfully requests a jury trial on all issues and claims so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A. A judgment that Oath has infringed, or in the alternative actively induced others to infringe, the ‘615 Patent;

B. A judgment that Oath’s infringement of the ‘615 Patent is willful;

C. Orders enjoining Oath, its officers, directors, servants, managers, employees, agents, successors, and assignees, and all persons in concert or participation with them, from infringing, or actively inducing others to infringe, the ‘615 Patent;

D. An award, pursuant to 35 U.S.C. § 284, to AlmondNet of all damages sufficient to compensate for Oath’s infringement of the ‘615 Patent owned by AlmondNet, together with pre-judgment and post-judgment interest and costs;

E. An award of increased damages, pursuant to 35 U.S.C. § 284, in an amount not less than three times the amount of actual damages awarded to AlmondNet, by reason of Oath’s willful infringement of the patents-in-suit.

F. An award of reasonable attorneys’ fees, pursuant to 35 U.S.C. § 285, as this is an exceptional case.

G. An award to AlmondNet of such other and further relief as this Court deems just and proper.

Dated: June 26, 2018

Respectfully submitted,

FARNAN LLP

*<u>/s/ Brian E. Farnan</u>*

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Of Counsel:

Louis J. Hoffman
LOUIS J. HOFFMAN, P.C.
7689 East Paradise Lane, Suite 2
Scottsdale, Arizona 85260
Telephone: (480) 948-3295
Email: louis@valuablepatents.com

Ian B. Crosby, Esq.
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone: (206) 516-3880
Email: icrosby@susmangodfrey.com

*Attorneys for Plaintiff*